## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| HERMAN F. POTTER, | ) | CASE NO.  8:06CV648 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MEMORANDUM |
| | ) | AND ORDER |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of the Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Herman F. Potter ("Potter"), seeks review of a decision by the defendant, Michael J. Astrue, the Commissioner of the Social Security Administration ("SSA"), denying his application for disability benefits under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401 *et seq.* and supplemental security income under Title XVI of the Act, 42 U.S.C. §§ 1381 *et seq.*  After carefully reviewing the record, I conclude the SSA decision should be reversed and remanded for further proceedings consistent with this Memorandum.

### Procedural Background

Potter filed his applications for Title II and Title XVI benefits on November 10, 2003. (*See*, Filing No. 11, Social Security Transcript ("Tr.") at 90-92 and 322.)  Potter claims back and shoulder injuries have rendered him disabled and unable to work since September 18, 2003.  His applications for disability benefits were denied initially on January 14, 2004.  (Tr. 34-37; 327-30.)  A request for reconsideration was denied on March 31, 2004.  (Tr. 39-43.)

Potter filed a hearing request on April 29, 2004.  (Tr. 44.)  A hearing was held before an Administrative Law Judge ("ALJ"), in Omaha, Nebraska, on February 2, 2006.  (Tr. 338.)

On April 25, 2006, the ALJ issued an adverse decision.  (Tr. 13-28.)  On August 21, 2006, the Appeals Council of the Social Security Administration denied Potter's request for review.  (Tr. 7-9.)  Potter's current complaint for judicial review and reversal of the SSA decision was timely filed on October 11, 2006. (Filing No. 1.)

### Statement of the Facts

Potter was born in 1964.  (Tr. 141-50.)  On September 18, 2003, Potter was "flipping" shopping carts during the course of his employment, which entailed turning a stack of between 100 and 150 shopping carts from their wheels onto their baskets so that he could change the wheels.  (Tr. 347.)  In the process of flipping the carts, Potter felt something "pop" in his lower back.  (Tr. 342.)  Potter has not worked since that date.  (Tr. 342.)

### Medical Background

Potter sought treatment at the Plattsmouth Clinic of the Nebraska Medical Center on October 16, 2003, for low back pain.  (Tr. 189-90.)  Potter had spinal tenderness, but full range of motion and no neurological deficits.  (Tr. 189-90.)  He was assessed with back pain related to his lifting injury.  (Tr. 190.)  He was conservatively treated with Celebrex and Skelaxin, but told to return if after a few weeks he was still having symptoms.  (Tr. 190.)

On January 16, 2004, Potter sought treatment from James T. Biskup, M.D., for his back pain.  Dr. Biskup noted Potter had motion and strength deficits as well as tenderness and decreased range of motion.  (Tr. 224-25.)  Dr. Biskup referred Potter for an MRI and continued to treat Potter with pain medications.  (Tr. 224-25.)

2

On January 23, 2004, a lumbar spine magnetic resonance imaging (MRI) revealed a mild grade I anterior subluxation of L5 over S1 with formation of a small generalized disc bulge and severe bilateral neural foraminal stenosis; moderate right paramidline disc protrusion at L4-5 with slight downward extrusion and compression of the right lateral recess of the thecal sac; and small to moderate sized midline disc protrusion with slight downward extrusion at L3-4. (Tr. 231-32.)

Shawn Pettis, M.D., examined Potter on February 4, 2004, upon referral by Dr. Biskup. (Tr. 217.) Potter's gait was steady and nonantalgic, but his lumbar range of motion for flexion and extension was limited. (Tr. 217.) Dr. Pettis noted moderate to severe paravertebral spasm and moderate lumbar tenderness throughout the lumbar region bilaterally. (Tr. 217.) An epidural steroid injection was prescribed. (Tr. 217, 228-29.) Potter received his first steroid injections on February 10, 2004, and repeat injections were provided on March 19, 2004. (Tr. 226-29.)

Dr. Biskup examined Potter following the two injections on April 27, 2004, wherein he noted Potter's symptoms were worsening to a mild degree in spite of the two blocks. At that time, Dr. Biskup ordered another block and prescribed Skelaxin and Ultram. (Tr. 282-83.) In May 2004, Dr. Biskup examined Potter who was complaining of back pain, and numbness and cramps in his legs; he indicated that the prior spinal blocks helped for a couple of days. (Tr. 280.) Dr. Biskup continued Potter's medications and referred him to Dr. Long. (Tr. 281.)

On July 7, 2004, Douglas J. Long, M.D., a neurosurgeon, examined Potter at Dr. Biskup's request. (Tr. 281 and 244). Dr. Long determined that Potter had three levels of degenerative disc disease and a Grade 1 spondylolisthesis; however, he was uncertain

3

whether Potter would benefit from surgery.  (Tr. 244).  On October 12, 2004, Potter was again seen by Dr. Long.  Dr. Long determined that Potter continued to suffer from degenerative disc disease and that most of his symptoms were probably due to the L5-S1 listhesis. (Tr. 243.)  Dr. Long indicated that surgery might or might not improve his overall symptoms, but indicated that if Potter could "avoid surgery and continue his exercises, and off work, his pain may remain stable over time."  (Tr. 243.)

Dr. Biskup examined Potter in July, August and September of 2004.  On July 12, 2004, Dr. Biskup noted pain, weakness, numbness, tenderness and limping on examination. He prescribed Skelaxin and Darvocet.  (Tr. 278-79.)  In August, Dr. Biskup observed pain, numbness and tenderness on examination and renewed Potter's medications.  (Tr. 276-77.)  On September 14, 2004, Dr. Biskup noted Potter to be fatigued and depressed. In addition to his physical problems, Potter had been accused of sexually abusing a child. At that time, Lexapro was prescribed.  (Tr. 274-75.)  Potter continued to be depressed and anxious when he was seen by Dr. Biskup on October 8, 2004.  (Tr. 271-72.)

Potter subsequently saw Dr. Biskup to follow up on his depression and options for his back.  At that time, pain, stiffness and decreased lumbar range of motion continued to be noted and prescriptions for Lexapro, Xanax, Skelaxin and Ultram were given.  (Tr. 268-69.)  On February 17, 2005, Potter was noted again to be having problems with his shoulder and other symptoms of anxiety and depression were present.  (Tr. 253-67; 309-16.)  In April 2005, at his general physical, Dr. Biskup noted that Potter had significant weight gain, continued pain in his back, and anxiety.  (Tr. 259.)  In May 2005, Potter was again seen for problems with his back and numbness in his legs.  (Tr. 251-52.)  On

4

December 19, 2005, Dr. Biskup noted that the pain continued, but Potter was doing his "exercises" and seeing a chiropractor. Potter was advised to continue with his medications and was scheduled for another steroid injection. (Tr. 309-10.) On December 23, 2005, Potter again received a lumbar steroid injection. (Tr. 319-21.)

**Holyfield Examination**

Roy Holyfield, Jr., M.D., at the request of an Administrative Law Judge, examined Potter on July 19, 2005. (Tr. 288-92.) Dr. Holyfield noted the results of Potter's January 2004 lumbar spine MRI, and examination revealed mild to moderate lumbar muscle tightening and moderate lordotic curve loss. (Tr. 290.) Dr. Holyfield also observed right shoulder crepitus with abduction and occasional palpable shoulder joint popping and Potter's motor strength was normal in all extremities. (Tr. 290.) Potter's lumbar range of motion was reduced, but his gait was "very normal" and he could maneuver the examination table without difficulty or assistance. (Tr. 291.) Dr. Holyfield opined that Potter could lift twenty pounds occasionally and ten pounds frequently, and stand and walk at least two hours in an eight-hour workday, but he needed to alternate sitting and standing periodically to relieve his pain and discomfort. (Tr. 291, 293-94.) Dr. Holyfield further opined that pushing and pulling should only be performed occasionally and for short periods of time, and Potter needed to stretch his muscles frequently. (Tr. 291-92, 294.) Climbing was not recommended and stooping was to be avoided, but Potter could occasionally balance, kneel, crouch, or crawl. (Tr. 292, 294.) There were no restrictions with manipulative functions, but Dr. Holyfield felt that overhead reaching should be performed only occasionally. (Tr. 292, 295.)

5

**Psychological Evaluation**

Potter was referred to Eugene Egnoski, Ph.D., by the Nebraska Health and Human Services for a psychological evaluation as part of his request for benefits from that agency. On July 20, 2005, Potter was evaluated by Dr. Egnoski. (Tr. 297-302.) Dr. Egnoski found that Potter was well oriented and his remote and recent memory were intact, but his immediate memory appeared weak. (Tr. 299.) Potter organized his thoughts clearly and logically, and his judgment was intact. (Tr. 299.) But, Dr. Egnoski opined that Potter's intelligence was borderline normal, finding that Potter had difficulty with two-digit addition, subtraction, and single digit multiplication. (Tr. 299-300.) Additionally, Potter's abstract thinking was weak in that he had trouble giving similarities and difference between common objects. (Tr. 300.) Most notably, Dr. Egnoski found that Potter's "attention and concentration are poor. He has a difficult time completing tasks" and "his immediate attention span is weak." (Tr. 301-02.)

Dr. Egnoski diagnosed major depressive disorder, single episode, and estimated Potter's global assessment of functioning[1] (GAF) to be 51.[2] (Tr. 301.) Dr. Egnoski noted that the depression was breaking though the anti-depressants. He opined that Potter's ability to understand and remember short and simple instructions was unlimited, but his ability to carry them out was moderately limited due to depression with poor immediate memory and back pain. (Tr. 303.) His ability to make simple work-related judgments was

---

[1] Global assessment of functioning is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. See American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed., text revision 2000)("DSM-IV-TR.")

[2] GAF of 51 through 60 is characterized by moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers.) See DSM-IV-TR 34.

not limited. (Tr. 303.)   Dr. Egnoski further opined that Potter's ability to respond appropriately to work pressures and interact appropriately with the public, supervisors, and co-workers was moderately limited.   (Tr. 304.)   His ability to respond appropriately to changes in a routine work setting was markedly limited.   (Tr. 304.)

**Potter's Testimony**

Potter testified at the February 2, 2006, administrative hearing.   (Tr. 338-68.)   Potter stated that pain and muscle spasms in his back, groin, legs, feet, neck, and shoulders prevented him from working.   (Tr. 344.)   He received epidural injections which helped his muscle spasms, but not his pain; and medication that helped his pain, but did not totally relieve it.   (Tr. 345 and 348.)   He also used heat and ice which helped, and smoked marijuana for the pain.   (Tr. 355, 356, 360-61.)   Potter testified that his depression was a result of his inability "to go to work and make a living for my family."   (Tr. 346.)   Potter further testified that he was in special education classes "all through school."   (Tr. 351.) He initially stated that he did not really have problems with math, but upon further questioning stated that he ran into "some complications" with a checking account.   (Tr. 351.) He read slowly and had problems "pronouncing some words" but remembered what he read.   (Tr. 352.)   Potter stated that he spent his days teasing his dog, watching television, taking his children to school, driving, and helping with dishes and laundry.   (Tr. 353-55.)

Potter estimated that he could lift a gallon of milk or case of soda with both hands, lift his hands overhead, push a door open, and sit up 30 to 45 minutes before getting restless and experiencing legs cramping and numbness.   (Tr. 349-50.)   He further

7

estimated that he could walk 50 feet and stand 30 to 45 minutes before needing to rest for 15 minutes.  (Tr. 350-51.)

**Vocational Expert's Testimony**

Warren Haagenson, a vocational expert, also testified at the administrative hearing. (Tr. 361-66.) The ALJ asked the expert to assume an individual of Potter's age, education, and work experience who could lift 20 pounds occasionally and 10 pounds frequently, stand for two hours, sit for six hours, and needed the opportunity to change positions every 30 to 45 minutes to stretch his back.  (Tr. 361-62.)  In addition, the individual could not climb ladders or stairs, and pushing and pulling with the lower extremities or overhead reaching should be avoided.  (Tr. 362.)  Further, he was moderately limited in his ability to carry out simple instructions; understand and remember detailed instructions; interact with the public, supervisors, and co-workers; deal with work pressures; and deal with changes in a routine work setting.  (Tr. 362.)  In response, the vocational expert testified that the individual could perform sedentary unskilled work as a small parts assembler, food and beverage order clerk, and charge account clerk.  (Tr. 363-65.)

**ALJ's Findings**

The ALJ found Potter had acquired sufficient quarters of coverage to satisfy Title II of the Act.  (Tr. 27.)  He found that Potter had not engaged in substantial gainful activity since the alleged onset of disability.  (Tr. 27.)  He determined that Potter had a combination of impairments considered "severe" based on the requirements in the regulations, 20 C.F.R. §§ 404.1520(c), but that the Potter did not meet or equal the Listings in Appendix 1 to Subpart P of Regulation 4.  (Tr. 27.)  Further, the ALJ determined that Potter's

allegations regarding the degree of his symptoms and limitations were not fully credible.

The ALJ determined that Potter retained residual functional capacity to:

> lift, carry, push, or pull 20 pound maximum occasionally and 10 pounds frequently, but must avoid any pushing or pulling with the bilateral lower extremities.  He must avoid overhead reaching, but otherwise retains no significant limitation of ability to utilize his bilateral upper extremities and hand to preform basic manipulative work-related activities including reaching, handling, fingering, or feeling within those weight limits.  He is capable of sitting 6 hours total and standing and/or walking up to 2 hours total throughout the course of a normal 8-hour workday, but is limited to jobs that accord a worker the option to alternate between sitting and standing and the opportunity to change positioning at no greater than 30 to 45-minute intervals. He is precluded from climbing ladders or stairs, but otherwise is capable of occasionally performing other basic postural work-related activities including crouching, balancing, stooping, kneeling, or crawling. He retains a moderate limitation of ability to understand, remember, or carry out detailed or complex job instructions or tasks, but is capable of sustaining adequate attention, concentration, persistence, and pace with simple, repetitive tasks consistent with unskilled work throughout the course of a normal 8-hour workday.  Secondary to moderate limitations of social functioning, he is not precluded from social interactions with others, but is limited to job tasks that require brief and superficial contacts with supervisors, coworkers, or the general public. He retains a moderate limitation of ability to deal with work pressures and routine changes in ususal work setting.

(Tr. 27.)   Additionally, the ALJ determined that Potter was unable to perform any of his past relevant work.  (Tr. 25.)  He found that Potter remained a "younger individual" at all relevant times.  (Tr. 25.)  Further, the ALJ found that Potter had a "high school" equivalent education and a skilled work background, although had no skills transferable within his residual functioning capacity, and transferability of skills was not a pivotal issue in the ALJ's opinion.  (Tr. 25.)

The ALJ determined that while Potter did not have the residual functional capacity to perform the entire range of sedentary work, there were significant numbers of jobs within the regional and national economy that Potter could perform.  (Tr. 28.)

9

**Issues Presented**

Potter appealed the Commissioner's final decision on the following grounds:

- The Commissioner failed appropriately to identify Potter's past relevant work and his correct educational level resulting in an erroneous denial of benefits;

- The Commissioner's determination that Potter could perform work which exists in substantial numbers relied on improper evidence from the vocational expert and therefore was not supported by substantial evidence on the record as a whole;

- The ALJ failed fully to develop the record and provide appropriate medical support for the residual functional capacity findings;

- The ALJ improperly dismissed Potter's testimony as not being credible; and

- The Commissioner failed appropriately to account for all of Potter's impairments in determining his residual functional capacity.

*See*, Filing No. 16, Potter's Brief in Support of Complaint.

**Standard of Review**

In reviewing a decision to deny disability benefits, a district court does not reweigh evidence or the credibility of witnesses or revisit issues *de novo. Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995); *Harris v. Shalala,* 45 F.3d 1190, 1193 (8th Cir. 1995).  Rather, the district court's role under 42 U.S.C. § 405(g) is limited to determining whether substantial evidence in the record as a whole supports the Commissioner's decision and, if so, to affirm that decision.  *Harris,* 45 F.3d at 1193.

"Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."  *Holmstrom v. Massanari,* 270 F.3d 715, 720 (8th Cir. 2001). The Court must consider evidence that both detracts from, as well as supports, the Commissioner's decision.  *Id.*; *Morse v. Shalala,* 16 F.3d 865, 870 (8th Cir. 1994).  As long as substantial evidence supports the Commissioner's decision, that

10

decision may not be reversed merely because substantial evidence would also support a different conclusion or because a district court would decide the case differently. *McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir. 2000); *Harris,* 45 F.3d at 1193.

### Analysis

**"Disability" Defined**

An individual is considered to be disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The physical or mental impairment must be of such severity that the claimant is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). If the claimant argues that he has multiple impairments, the Act requires the Commissioner to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B).

**Sequential Evaluation and Residual Functional Capacity**

In determining disability, the Act follows a sequential evaluation process. *See* 20 C.F.R. § 416.920. In engaging in the five-step process, the ALJ considers whether: 1) the claimant is gainfully employed; 2) the claimant has a severe mental or physical impairment; 3) the impairments, singly or combined, meet the criteria of the "listings"; 4) the impairment prevents the claimant from performing past relevant work; and 5) the

11

impairment necessarily prevents the claimant from doing any other work. *Id.* If a claimant cannot meet the criteria at any step in the evaluation, the process ends and the determination is one of no disability. *Id.*

Residual functional capacity is defined as what the claimant "can still do despite . . . limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a). Residual functional capacity is an assessment based on all "relevant evidence," including observations by treating or examining physicians or psychologists, family, and friends; medical records; and the claimant's own description of his limitations. *Id.* §§ 404.1545(a)-(c), 416.945(a)-(c). *McKinney v. Apfel,* 228 F.3d 860, 863-64 (8th Cir. 2000). An ALJ may resolve conflicts among various treating and examining physicians, assigning weight to the opinions as appropriate. *Pearsall v. Massanari,* 274 F.3d 1211, 1219 (8th Cir. 2001).

The ALJ must make explicit findings regarding the actual physical and mental demands of the claimant's past work. *Pfitzner v. Apfel,* 169 F.3d 566, 569 (8th Cir. 1999). The ALJ may discharge this duty by referring to the specific job description in the United States Dep't of Labor, Employment and Training Admin., Dictionary of Occupational Titles (DOT) that are associated with the claimant's past work. *Id.*

**Past Relevant Work**

In this matter, the ALJ relied on a Past Relevant Work Summary completed by the vocational expert to determine that Potter's past relevant work was preformed at the skilled and semi-skilled level. (Tr. 25 and 186.) Potter alleges the job titles and work actually performed do not correspond to the DOT at skill levels listed by the vocational expert. In response, the Commissioner indicates that he disagrees, but does not provide any

12

authority or explanation as to why he disagrees.  Instead, the Commissioner argues that any error is harmless.

The vocational expert relied on Potter's social security file to complete the Past Relevant Work Summary and made no changes based upon Potter's testimony.  (Tr. 361.) The descriptions in Potter's social security file indicated that he "flipped carts, changed wheels, painted, cleaned [carts]" and "cleaned, repaired, painted, stacked [shopping] carts."  (Tr. 110 and 143.)  Potter's position as a school cleaner is described as "cleaned a school at night ran buffer and scrubber."  (Tr. 112.)  Finally, Potter's roofing position is described as "roofed houses and small businesses."  (Tr. 113.)

The vocational expert placed Potter's past work experience as a Maintenance Worker at DOT 809.684-034 (skilled, SVP 5)[3]; School Cleaner at DOT 382.664-010 (semi-skilled. SVP 3)[4]; Roofing Labor DOT 869.664-014 (semi-skilled, SVP 4)[5].

---

[3]  The DOT 809.684-034 provides:

REPAIRER, FINISHED METAL (any industry)

Repairs surface defects, such as dings, dents, and buckles, in finished metal items, such as automobile bodies, refrigerators, or other appliances, using dolly blocks, ding and pick hammers, and other handtools: Visually examines and feels surface of workpiece to determine extent of defect. Holds dolly block against defect and hammers opposite side to smooth surface, being careful not to stretch surface or mar finish. Cleans and polishes repaired area, using buffer and cloth. May file dings to remove burrs and rough spots. Polishes working surfaces of dolly blocks and hammers, using naphtha-soaked emery cloth to prevent scratching or gouging of workpiece.

[4]  DOT 382.664-010 provides:

JANITOR (any industry) alternate titles: maintenance engineer; superintendent, building

Keeps hotel, office building, apartment house, or similar building in clean and orderly condition and tends furnace, air-conditioner, and boiler to provide heat, cool air, and hot water for tenants, performing any combination of following duties: Sweeps, mops, scrubs, and vacuums hallways, stairs and office space. Regulates flow of fuel into automatic furnace or shovels coal into hand-fired furnace. Empties tenants' trash and garbage containers. Maintains building, performing minor and routine painting, plumbing, electrical wiring, and other related maintenance activities, using handtools. Replaces air-conditioner filters.

Clearly, DOT 809.684-034, DOT 382.664-010 and DOT 869.664-014 do not apply to jobs described by Potter's testimony or the descriptions listed in Potter's social security file.  Potter's Maintenance Worker position consisted of flipping shopping carts from their wheels on to their baskets and replacing the wheels.  This did not entail "repairs surface defects . . .using dolly blocks, ding and pick hammers, and other handtools," or any of the other work skills listed in DOT 809.684-034. Similarly, there is no evidence to support a finding by the ALJ that Potter's position as a school cleaner is equivalent to DOT 382.664-010 or that  Potter's roofing position as a DOT 869.664-014.

This error is not harmless because, as will be discussed *infra.*, the ALJ relied upon the finding that Potter worked skilled and semi-skilled positions to determine Potter's

---

Cautions tenants regarding complaints about excessive noise, disorderly conduct, or misuse of property. Notifies management concerning need for major repairs or additions to lighting, heating, and ventilating equipment. Cleans snow and debris from sidewalk. Mows lawn, trims shrubbery, and cultivates flowers, using handtools and power tools. Posts signs to advertise vacancies and shows empty apartments to prospective tenants. May reside on property and be designated Manager, Resident (any industry).

[5] DOT 869.664-014, provides in relevant part: CONSTRUCTION WORKER I (construction):

Performs any combination of following duties on construction projects, usually working in utility capacity, by transferring from one task to another where demands require worker with varied experience and ability to work without close supervision: Measures distances from grade stakes, drives stakes, and stretches tight line. Bolts, nails, aligns, and blocks up under forms. Signals operators of construction equipment to facilitate alignment, movement, and adjustment of machinery to conform to grade specifications. Levels earth to fine grade specifications, using pick and shovel. Mixes concrete, using portable mixer. Smooths and finishes freshly poured cement or concrete, using float, trowel, or screed. Positions, joins, aligns, and seals pipe sections. Erects scaffolding, shoring, and braces. Mops, brushes, or spreads paints or bituminous compounds over surfaces for protection. Sprays materials such as water, sand, steam, vinyl, paint, or stucco through hose to clean, coat, or seal surfaces. Applies caulking compounds by hand or with caulking gun to seal crevices. Grinds, sands, or polishes surfaces, such as concrete, marble, terrazzo, or wood flooring, using abrasive tools or machines. Performs variety of tasks involving dextrous use of hands and tools, such as demolishing buildings, sawing lumber, dismantling forms, removing projections from concrete, mounting pipe hangers, and cutting and attaching insulating material. Work is usually performed with other workers. May be designated according to duties performed . . . Roofer, Vinyl Coating (construction).

14

educational level and to discount Dr. Egnoski's assessments regarding Potter's mental deficits.  The ALJ then erroneously relied on those determinations when assessing Potter's credibility and his residual work capacity.  (See respectively, Tr. 17, 24, 19, and 25.)  On remand, the ALJ is instructed to determine Potter's past relevant work based upon the evidence in the record to correspond with the correct DOT title and skill level determination.

### Educational Level

The ALJ's decision indicated that "claimant testified he attended high school through the 9th grade, but did not finish the 10th grade, and he acknowledged he is literate and capable of remembering material he has read.  .  .  .  he reported he attained a GED in 1988."[6]  (Tr. 25.)  The ALJ determined that Potter "has a high school equivalent education through participation in some special education coursework and past relevant work experience at up to the semi-skilled and skilled levels."  (Tr. 17.)

Under 20 C.F.R. § 404.1564,  "education is primarily used to mean formal school or other training which contributes to your ability to meet vocational requirements." Additionally, "the numerical grade level that you completed in school may not represent your actual educational abilities.  These may be higher or lower.  However, if there is no other evidence to contradict it, we will use your numerical grade level to determine your educational abilities."  *Id.*

The record indicates that Potter received his GED in 1988.  However, his educational records indicate that he was in special education classes, has a borderline

---

[6]  The ALJ also notes a reference to a high school graduation in 1982 in the consultative psychological evaluation report.  However, the educational records provided by the Council Bluffs Schools indicate that Potter was in 10th grade in the fall of 1981 when he dropped out.  (Tr. 184).

range of I.Q. functioning[7], difficulty doing basic arithmetic, an impaired ability at abstract thinking, and difficulty giving similarities and differences between common objects. (Tr. 181, 300-02, 351.) This evidence contradicts using his GED to equate to a high school equivalency. However, it is not clear from the record whether the ALJ took Potter's mental ability into account when determining Potter's educational level. Additionally, it is impossible to discern from the record how much weight the ALJ gave to his assessment of Potter's past relevant work at the skilled to semi-skilled level when he determined Potter's educational level. Thus, on remand, it will be necessary for the ALJ to assess Potter's education level based upon the information in the record.

**Dr. Egnoski's Psychological Report**

"The opinion of a consulting physician who examines a claimant once . . . does not generally constitute substantial evidence." *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998). Nonetheless, there are two exceptions to this general rule: (1) where [the one-time] medical assessments are supported by better or more thorough medical evidence, or (2) where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Cantrell v. Apfel*, 231 F.3d 1104, 1107 (8th Cir. 2000) (internal citations and quotations omitted).

In this case, the only medical evidence of Potter's mental abilities is Dr. Egnoski's psychological exam. Nonetheless, the ALJ opined:

---

[7] While this Court was provided with a poor photocopy, Potter's educational records seem to indicate two entries for IQ tests. The first, in October 1977, indicates a IQ of 74. The second, in August 1980, indicates that his IQ was assessed as a 62. (Tr. 181.) Potter's Drop Out Forms indicate that he was assessed in February, 1980 with an IQ of 81, but there is no indication of this exam on his Tests of Mental Ability Form. (Tr. 181, 184.)

16

> Although Dr. Egnoski opined that claimant retained moderate deficits with even short, simple instructions and ability to maintain social interactions in the workplace, as well as marked limitation of ability to respond appropriately to changes in routine work setting, the treatment notes from primary treating physicians repeatedly reflect occasions wherein claimant demonstrated no such deficits prior and subsequent to the date of the examination and those opinions are not reconciled with the claimant's previously-demonstrated capacity to perform semi-skilled and skilled work and maintain adequate social functioning and adaptions in the workplace despite his borderline to "borderline normal" intellectual function.

(Tr. 24.) However, the record reflects that Potter's treating physicians noted and treated Potter's depression and anxiety. While the treatment notes from Potter's physicians' do not indicate any mental deficits other than depression and anxiety, there is no evidence that Potter's treating physicians ever conducted psychological or other mental examinations of Potter. Thus, Dr. Egnoski's assessments are based upon better and more thorough medical evidence than the lack of a such an assessment in the report of a treating physician.

Moreover, the record supports Dr. Egnoski's findings. As indicated above, Potter did not perform skilled and semi-skilled work as opined by the ALJ. Thus, the ALJ erred in using this determination to discount the only medical opinion regarding Potter's mental capacity. Further, Potter's high school IQ tests, and poor work history, and his inability to maintain employment for any substantial length of time, is consistent with Dr. Egnoski's report.

I find that the ALJ stated no reasonable justification for rejecting Dr. Egnoski's psychological assessment, since most psychological assessments are based in large part on the self-reporting of the patient. *Pratt v. Sullivan*, 956 F.2d 830, 834 (8th Cir.1992) (per curiam) (reversible error for ALJ to substitute his own conclusions for diagnosis of

17

examining psychiatrist).  The claimant "is entitled to a fair evaluation of [his] capabilities," *O'Leary v. Schweiker*, 710 F.2d 1334, 1342 (8th Cir. 1983), and the "ALJ must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work history, and observations by third parties and treating and examining physicians." *Morse*, 32 F.3d at 1230 (quotation omitted).  Thus, on remand, it will be necessary for the ALJ to assess Potter's mental abilities based upon the information in the record giving proper weight to Dr. Egnoski's report.

**Credibility**

The Eighth Circuit Court of Appeals recently summarized an ALJ's duty with regard to assessing a social security claimant's credibility relative to subjective complaints, including pain:

> A claimant's subjective complaints may be discounted if there are inconsistencies in the record as a whole.  20 C.F.R. § § 404.1529, 416.929; *McKinney v. Apfel*, 228 F.3d 860, 864 (8th Cir. 2000); *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).   In evaluating subjective complaints, however, the ALJ must consider objective medical evidence, as well as any evidence relating to the so-called *Polaski* factors, namely: (I) a claimant's daily activities; (ii) the duration, frequency, and intensity of the claimant's pain; (iii) precipitating and aggravating factors; (iv) dosage, effectiveness, and side effects of medication; and (v) functional restrictions.  *Polaski*, 739 F.2d at 1322.  In rejecting a claimant's complaints of pain as not credible, we expect an ALJ to "detail the reasons for discrediting the testimony and set forth the inconsistencies found."  *Lewis v. Barnhart*, 353 F.3d 642, 647 (8th Cir. 2003).

*Guilliams v. Barnhart*,  393 F.3d 798, 801-802 (8th Cir. 2005).  While the ALJ discussed several of the *Polaski* factors, the ALJ made no finding regarding the dosage, effectiveness

18

or side effects of Potter's medication.[8]  Further, in discounting Dr. Egnoski's findings, the ALJ did not adequately determine if Potter's poor work history was a result of continuing mental impairment or evidence of a unwillingness to work.  The ALJ's failure properly to evaluate a claimant's alleged mental disorder influences the evaluation of the claimant's subjective complaints of pain under *Polaski*.  *Pratt v. Sullivan*, 956 F.2d 830, 836 (8th Cir. 1992).  Thus, on remand it will be necessary for the ALJ to reassess Potter's credibility in light of his medications and Dr. Egnoski's report.

**Residual Functioning Capacity**

> The Court of Appeals for the Eighth Circuit has stated:
>
> Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence," *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000), we have also stated that a "claimant's residual functional  capacity is a medical question," *Singh,* 222 F.3d at 451. "[S]ome medical evidence," *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam), must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace," *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000).

*Lauer v. Apfel*, 245 F.3d 700, 703-04 (8th Cir. 2001).  It is well-established that a hypothetical question need only include those impairments and limitations found credible by the ALJ. *See Vandenboom v. Barnhart,*  421 F.3d 745, 750 (8th Cir. 2005)*, Forte v. Barnhart*, 377 F.3d 892, 897 (8th Cir. 2004).

---

[8] The ALJ devotes a part of his discussion regarding Potter's credibility  to an echocardiogram study performed in April 2005.  (Tr. 21-22; 286.)  However, there is no indication in the record that Potter's heart affects the pain, or lack thereof, in his back, and, therefore, I fail to see its relevance to Potter's pain credibility on that issue.

The ALJ in his determination indicted that Potter "is capable of *sustaining adequate attention, concentration*, persistence, and pace with simple, repetitive tasks consistent with unskilled work throughout the course of a normal 8-hour workday." (Tr. 27, emphasis added.)  However, there is no support in the record for this determination. The only evidence in the record regarding Potter's attention span and concentration is Dr. Egnoski's findings that Potter's "attention and concentration are poor.  He has a difficult time completing tasks," and that his "immediate attention span is weak."  (Tr. 300-01.)

On remand, the ALJ should consider Potter's mental capacity as provided by Dr. Egnoski when providing the hypothetical.  Additionally, the hypothetical should take into account Potter's past relevant work at the proper skill level and his proper educational level.

### Conclusion

I find that the ALJ did not properly evaluate the skill level of Potter's past relevant work.  This improper determination was relied upon by the ALJ in determining Potter's educational level, mental impairments, credibility, and residual functional capacity. Moreover, I specifically conclude that the ALJ erroneously rejected Dr. Egnoski's opinion related to Potter's mental capacity.

Because of these errors, I conclude that the Commissioner failed to meet his burden to demonstrate that Potter retains the residual functional capacity to perform the work listed by the vocational expert.  I remand for further proceedings consistent with this Memorandum.

20

IT IS ORDERED:

1.     The Plaintiff's appeal is granted;

2.     The case is reversed and remanded;

3.     On remand, the ALJ should correctly assess Potter's past relevant work and

       educational level, reconsider Potter's credibility after taking into account Dr.

       Egnoski's report and performing a *Polaski* analysis, determine Potter's

       residual functional capacity based on both his physical and mental

       limitations, and conduct further proceedings consistent with this

       Memorandum and Order; and

4.     A separate judgment shall be filed.

DATED this 11th day of October, 2007.

                              BY THE COURT:


                              s/Laurie Smith Camp
                              United States District Judge

21